UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5/8/14
```

——————————————————————X

PEDRO SANTANA,

      **Plaintiff,**

  - against -

CITY OF NEW YORK, CORIZON
HEALTH, INC., DR. MOHAMMAD
AKHTAR, M.D., and DR. IOSIF SHPITS,
M.D.,

      **Defendants.**

——————————————————————X

**OPINION AND ORDER**

**13 Civ. 3034 (SAS)**

SHIRA A. SCHEINDLIN, U.S.D.J.:

## I.     INTRODUCTION

      Pedro Santana, presently incarcerated and proceeding pro se, brings

this action pursuant to section 1983 of Title 42 of the United States Code.  Santana

sues the City of New York ("the City"), Corizon Health, Inc. ("Corizon"), Dr.

Mohammad S. Akhtar, and Dr. Iosif Shpits.  Corizon provides medical services to

New York City Department of Corrections ("DOC") inmates housed at the

Manhattan Detention Center and the Brooklyn Detention Center.[1]  Dr. Akhtar and

—————————————

[1]     *See* Defendants' Local Rule 56.1 Statement of Material Facts in
Support of Summary Judgment ("Def. 56.1") ¶¶ 9, 13.

Dr. Shpits are employees of Corizon who treated Santana while he was incarcerated at the Manhattan Detention Center and the Brooklyn Detention Center, respectively.[2]  Santana alleges that defendants deprived him of medical treatment in violation of the Eighth and Fourteenth Amendments.  He also brings state law claims for negligence and violations of New York City Correctional Health Care Minimum Standards.[3]  Santana seeks a declaration that defendants were negligent and violated his constitutional rights.  He also seeks injunctive relief, compensatory damages, and punitive damages in the amount of $9,999,000 against each defendant.

Defendants move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on the grounds that Santana has failed to exhaust administrative remedies pursuant to the Prison Litigation Reform Act ("PLRA"),[4] that his medical condition was not sufficiently serious to form the basis of a claim for deliberate indifference to medical needs, and that he has failed to show that a

---

[2]     *See id.* ¶¶ 10, 15.

[3]     Santana brings additional state law claims in his sur-reply.  Because Santana was recently given leave to amend his complaint but did not raise these claims until defendants' motion papers were fully submitted, the Court will not consider them.

[4]     *See* 42 U.S.C. § 1997e(a).

policy, custom or practice caused his constitutional rights to be violated.[5]  For the reasons stated below, defendants' motion for summary judgment is GRANTED.

## II.   BACKGROUND

Santana was diagnosed with "moderate" sleep apnea in 2011 and was prescribed a continuous positive airway pressure ("CPAP") machine.[6]  In October 2012, Santana was incarcerated at the Westchester County Jail and was provided with a CPAP machine in early December.[7]  Santana was transferred to the Manhattan Detention Center on December 11, 2012.[8]  During his medical intake screening, Santana told the nurse that he had "severe" sleep apnea.[9]  The nurse did not address his concerns, but told him that he would be seen by a physician shortly.[10]  On December 12, Santana was examined by Dr. Akhtar.[11]  Santana

---

[5]     *See Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).

[6]     Medical Records from Dr. Ahmed A. Fadil ("Sleep Clinic Records"), Ex. A to Declaration of Santana in Opposition to Defendants' Motion for Summary Judgment ("Santana Decl."), at 15.

[7]     *See* Def. 56.1 ¶¶ 7–8; Supplemental Memorandum of Law in Support of Defendants' Motion for Summary Judgment ("Supp. Mem.") at 4.

[8]     *See* Def. 56.1 ¶ 9.

[9]     *Id.*

[10]    *See id.*

[11]    *See id.* ¶ 10.

informed Akhtar that he was being treated with a CPAP machine, and that the machine "was a life support system, since he coulden't [sic] sleep without it and could die in his sleep."[12]  Akhtar told Santana that the Manhattan Detention Center did not provide inmates with CPAP machines, but noted Santana's diabetes and flat feet and ordered that Santana be allowed to keep his own shoes.[13]  That same day, Santana submitted a grievance to the Manhattan Detention Center's Inmate Grievance Department requesting that he be transferred to a facility that provides CPAP machines.[14]  He later spoke to a nurse practitioner about his request for a CPAP machine and was told to speak to a physician about his concerns.[15]  His blood glucose was recorded by medical staff at least once a day each day he was at the Manhattan Detention Center.[16]

---

[12]     Santana's Local Rule 56.1 Statement of Material Facts in Opposition to Defendants' Motion for Summary Judgment ("Santana 56.1") ¶ 9.

[13]     *See* Transcript of Santana Deposition ("Santana Dep."), Ex. E to Declaration of Jonathan Waldauer, counsel to defendants ("Waldauer Decl."), at 47:17–22.; DOC Medical Records, Ex. G to Waldauer Decl., at CHS 041.

[14]     *See* Grievances, Ex. K to Santana Decl., at 1 (December 12 grievance).

[15]     *See* Def. 56.1 ¶ 12.

[16]     *See* DOC Medical Records at CHS 073.

On December 16, Santana was transferred to the Brooklyn Detention Center and received a medical intake screening.[17]  When Santana informed the nurse that he had sleep apnea and required a CPAP machine, the nurse replied that the Brooklyn Detention Center did not provide CPAP machines.[18]  Santana alleges that, in response to his request to be transferred to a facility that provides CPAP machines, the intake nurse told him to "take it up with corrections."[19]  Santana was returned to his cell, where he complained to a corrections officer about his situation.[20]  The corrections officer told Santana that his complaint would be dealt with by the medical department, "and if that doesn't work, [s]ubmit a grievance."[21]  For the following week, Santana was seen by a nurse every day for glucose testing and was repeatedly told that he would see a doctor shortly.[22]  Dr. Shpits saw Santana on or around December 23.[23]  Santana told Shpits that he needed a CPAP

---

[17]    *See* Def. 56.1 ¶ 13.

[18]    *See id.*

[19]    Santana 56.1 ¶ 11.

[20]    *See* Complaint ¶ 14.

[21]    *Id.*

[22]    *See* Def. 56.1 ¶ 14.

[23]    *See id.* ¶ 15.

machine and that he could "pass away in [his] sleep" without access to one.[24] Shpits confirmed that the Brooklyn Detention Center did not provide CPAP machines.[25]

Shpits saw Santana again on January 2, and Santana once more asked for a CPAP machine.[26] Shpits took Santana's vitals and "stated that [he] was fine," but did not address Santana's concerns about a CPAP machine.[27] The record of this exam indicates that Santana's heart rate was "normal," his lungs were "clear," and his pain was a zero out of ten.[28] On January 4, a member of the medical staff took Santana's vitals and recorded that Santana was not in any pain.[29] Shpits saw Santana again on January 7, and noted that Santana was not in any pain, his heart rate was regular, his lungs were clear, and his mental status was "alert" and "euthymic."[30] Santana alleges that Shpits said on two occasions that he would

---

[24] Complaint ¶ 15.

[25] *See* Def. 56.1 ¶ 15.

[26] *See* Santana 56.1 ¶ 13.  Based on Santana's deposition testimony, defendants assert that Santana only asked Shpits for a CPAP machine on one occasion.  *See* Def. 56.1 ¶ 15.

[27] Santana 56.1 ¶ 13.

[28] DOC Medical Records at CHS 026–29.

[29] *See id.* at CHS 024.

[30] *Id.* at CHS 021–22.

"look into" transferring Santana to a medical facility that provided CPAP

machines, "but nothing was ever done nor was [Santana] ever transferred to" such

a facility.[31]  On January 7, 2013, Santana submitted a grievance to the Brooklyn

Detention Center's Inmate Grievance Department requesting to be transferred to a

facility that provides CPAP machines.[32]  Santana claims he was "complaining a

lot" in the following weeks, but does not remember seeing Dr. Shpits again during

this period.[33]

On January 29, Santana was transferred to the Westchester County

Jail and was returned to the Brooklyn Detention Center on February 19.[34]  The

medical department at the Westchester County Jail provided Santana with a letter

informing the Brooklyn Detention Center medical staff that he suffered from sleep

apnea.[35]  Santana gave this letter to Officer Murdok, a corrections officer who told

him that the medical staff would not see him and would not accept the letter.[36]  On

---

[31]     Santana 56.1 ¶¶ 12–13.  Although apparently unrelated to his requests, Santana was transferred back to the Westchester County Jail less than a month later, where a CPAP machine was provided.  *See id.* ¶ 16.

[32]     *See* Def. 56.1 ¶ 16; Grievances at 2 (January 7 grievance).

[33]     Santana Dep. at 59:10–17.

[34]     *See* Def. 56.1 ¶¶ 17–18.

[35]     *See id.* ¶ 18.

[36]     *See id.*; Grievances at 3 (February 21 grievance).

February 20, Santana saw Dr. Shpits for an exam.[37]  Dr. Shpits recorded that, although "somnolent," Santana was not in any apparent distress, his heart was "normal," his lungs were "clear," and his pain level was a zero out of ten.[38]  The next day, another member of the medical staff took Santana's vitals and recorded his pain level as zero out of ten.[39]  On February 21, Santana submitted a grievance to the Brooklyn Detention Center's Inmate Grievance Department complaining about Officer Murdok and a nurse practitioner who allegedly refused to see him, claiming that "[t]hey put [his] life at risk!!!"[40]  Santana was transferred to the Westchester County Jail on February 26.[41]  This action was filed on May 3, 2013.

Santana was transferred back to the Manhattan Detention Center on approximately June 26.[42]  He again received a medical intake screening, spoke to the intake nurse about his sleep apnea, and requested a CPAP machine.[43]  Santana

---

[37]    *See* DOC Medical Records at CHS 011.

[38]    *Id.*

[39]    *See id.* at CHS 008.

[40]    Grievances at 3 (February 21 grievance).

[41]    *See* Santana 56.1 ¶ 21.

[42]    *See id.* ¶ 23.

[43]    *See* Santana Dep. at 65:12–25.

was not treated by Dr. Akhtar, and did not receive a CPAP machine before he was transferred to Rikers Island Correctional Facility on approximately June 28.[44]

Effective September 10, 2012, the Inmate Grievance and Request Program of the DOC no longer administers inmates' medical grievances "because medical personnel are employed by a private company under the supervision of the Department of Mental Health and Hygiene."[45]  Now, if an inmate has a complaint about his health care, "the inmate must draft a written request for a second opinion or a written complaint about health care and place it in the Second Opinion/ Complaint Box located in the clinic waiting area."[46]  Defendants contend that, upon arrival at a DOC facility, inmates are provided with a brochure that "outlines their rights and responsibilities as to medical care."[47]

Santana does not claim that he submitted a request for a second opinion at either facility.  Nor did he pursue the three grievances he filed before initiating this action.  Santana contends that he did not request a second opinion

---

[44]     *See id.* at 65:1–11.

[45]     Inmate Grievance and Request Program Procedures, Ex. B to Santana Decl., at 2.

[46]     Memorandum of Law in Support of Defendants' Motion for Summary Judgment ("Def. Mem.") at 4.

[47]     *Id.*

because he did not know that second opinions were given to inmates at DOC facilities.[48]  He argues that he did not follow up on his grievances because he never received a response and thought that further administrative action would be futile.[49] Despite defendants' contrary assertions,[50] Santana claims that inmates are not provided with information regarding medical grievances and that he never received a brochure or was otherwise informed of the second opinion procedure.[51]

Prior to Santana's incarceration, Dr. Ahmed Fadil diagnosed him with "moderate" sleep apnea and prescribed a CPAP machine.[52]  In a "Letter of Medical Necessity" dated August 20, 2013, Fadil characterized Santana's condition as "Severe Obstructive Sleep Apnea," for which a CPAP machine is "medically necessary," and directed that Santana should continue using the CPAP machine indefinitely.[53]  According to Dr. Fadil, "[f]ailure to treat sleep apnea will result in a

---

[48]     *See* Def. 56.1 ¶ 12; Santana Dep. 58:7–59:5.

[49]     *See* Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Pl. Mem.") at 2.

[50]     *See* Def. Mem. at 4.

[51]     *See* 2/20/14 Reply Affirmation in Further Support of Plaintiffs' [sic] Motion in Opposition to Defendants' Motion for Summary Judgement [sic] ("2/20/14 Santana Aff.") ¶ 7; Pl. Mem. at 2–3.

[52]     Sleep Clinic Records at 15; Santana 56.1 ¶¶ 2–4.

[53]     Sleep Clinic Records at 1.

-10-

wide range of medical complications to name a few, heart attacks, strokes,

hypertension, and chronic fatigue[.]"[54]

Defendants' medical expert, Dr. Fred Lin, who is the Director of the

Mount Sinai Sleep Surgery Center, reviewed Santana's complaint, medical records

and deposition testimony.[55]  In Dr. Lin's medical opinion, Santana suffers from

"moderate sleep apnea."[56]  Dr. Lin opines that there are no physiological

complications of untreated moderate sleep apnea besides loss of sleep and states

with "a reasonable degree of medical certainty" that Santana's "moderate sleep

apnea was not the cause of" Santana's other medical conditions.[57]

## III.   APPLICABLE LAW

### A.   Summary Judgment

"Summary judgment is appropriate 'only where, construing all the

evidence in the light most favorable to the non-movant and drawing all reasonable

inferences in that party's favor, there is no genuine issue as to any material fact

---

[54]     *Id.*

[55]     *See* Report of Dr. Fred Lin ("Lin Report"), Ex. A to Waldauer Decl.,
at 1.

[56]     *Id.* at 2.

[57]     *Id.*

and . . . the movant is entitled to judgment as a matter of law.'"[58]  "A genuine

dispute exists 'if the evidence is such that a reasonable jury could return a verdict

for the nonmoving party.'"[59]  "'A fact is material if it might affect the outcome of

the suit under the governing law.'"[60]

      "The moving party bears the burden of establishing the absence of any

genuine issue of material fact."[61]  To defeat a motion for summary judgment, the

non-moving party "'must do more than simply show that there is some

metaphysical doubt as to the material facts,'"[62] and "'may not rely on conclusory

allegations or unsubstantiated speculation.'"[63]

---

[58]    *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 19 (2d Cir. 2014) (quoting *McBride v. BIC Consumer Prods. Mfg. Co.,* 583 F.3d 92, 96 (2d Cir. 2009)) (other quotations omitted).

[59]    *Benn v. Kissane,* 510 Fed. App'x 34, 36 (2d Cir. 2013) *cert. denied,* 134 S. Ct. 78 (2013) (quoting *General Star Nat'l Ins. Co. v. Universal Fabricators, Inc.,* 585 F.3d 662, 669 (2d Cir. 2009)) (other quotations omitted).

[60]    *Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist.*, 673 F.3d 84, 94 (2d Cir. 2012) (quoting *Bessemer Trust Co. v. Branin*, 618 F.3d 76, 85 (2d Cir. 2010)).

[61]    *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

[62]    *Valenti v. Penn Mut. Life Ins. Co.*, 511 Fed. App'x 57, 58  (2d Cir. 2013) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586  (1986)).

[63]    *Northeast Research, LLC v. One Shipwrecked Vessel,* 729 F.3d 197, 214 (2d Cir. 2013) (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)).

"[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them.  Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution."[64]  "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."[65]

Although "[p]ro se parties are entitled to 'extra consideration' on summary judgment motions," they are not relieved from "the usual requirements of summary judgment."[66]  "Thus, a pro se plaintiff's 'failure to allege either specific facts or particular laws that have been violated renders his attempt to oppose defendants' motion [for summary judgment] ineffectual.'"[67]

---

[64]     *Gallo v. Prudential Residential Servs. Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).

[65]     *Redd v. New York Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).

[66]     *Maalouf v. Salomon Smith Barney, Inc.*, No. 02 Civ. 4470, 2004 WL 2008848, at *4 (S.D.N.Y. Sept. 8, 2004), *aff'd sub nom. Maalouf v. Citigroup Global Mkts., Inc.*, 156 Fed. App'x 367 (2d Cir. 2005) ("'[P]roceeding pro se does not otherwise relieve a litigant from the usual requirements of summary judgment, and a pro se party's "bald assertion," unsupported by evidence, is not sufficient to overcome a motion for summary judgment.'" (quoting *Cole v. Artuz*, No. 93 Civ. 5981, 1999 WL 983876, at *3 (S.D.N.Y. Oct. 28, 1999))).

[67]     *Anderson v. City of New York Dep't of Corr.*, No. 11 Civ. 4069, 2013 WL 702918, at *2 (S.D.N.Y. Feb. 26, 2013) (quoting *Kadosh v. TRW*, No. 91 Civ.

**B.     Section 1983**

"To prevail on a claim under 42 U.S.C. § 1983, a plaintiff must allege (1) 'that some person has deprived him of a federal right,' and (2) 'that the person who has deprived him of that right acted under color of state . . . law.'"[68]  Section 1983 "does not create a federal right or benefit; it simply provides a mechanism for enforcing a right or benefit established elsewhere."[69]  Imposition of liability under section 1983 requires a defendant's direct involvement in the alleged constitutional violation.[70]  "Because vicarious liability is inapplicable to . . . [section] 1983 suits, a plaintiff must [prove] that each Government-official defendant, through the official's own individual actions, has violated the Constitution."[71]  Thus, a

---

5080, 1994 WL 681763, at *5 (S.D.N.Y. Dec. 5, 1994)).

[68]     *Velez v. Levy*, 401 F.3d 75, 84 (2d Cir. 2005) (quoting *Gomez v. Toledo,* 446 U.S. 635, 640 (1980)).

[69]     *Morris-Hayes v. Board of Educ. of Chester Union Free Sch. Dist.*, 423 F.3d 153, 159 (2d Cir. 2005) (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985)).

[70]     *See Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) ("It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir. 1991))).

[71]     *Ashcroft v. Iqbal*, 556 U.S. 662, 676–77 (2009) (citations omitted) (rejecting the argument that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution").

supervisory official cannot be held liable solely on account of the acts or omissions of her subordinates.[72]

In *Monell v. New York City Department of Social Services*, the Supreme Court held that to establish a claim against a municipality under section 1983, a plaintiff must show harm resulting from an identified municipal "policy or custom."[73]  A municipality may not be found liable simply because one of its employees or agents is guilty of some wrongdoing.[74]  In the absence of an established written municipal policy, a plaintiff must prove that a practice "'was so persistent or widespread as to constitute a custom or usage with the force of law,'"[75] or that a practice or custom of subordinate employees was "'so manifest as to imply the constructive acquiescence of senior policy-making officials.'"[76]  Thus, municipal liability under section 1983 may be established through evidence that

---

[72]     *See Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013) ("[I]n order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, *inter alia,* the defendant's personal involvement in the alleged constitutional deprivation.").

[73]     436 U.S. 658, 694 (1978).

[74]     *See Cash v. County of Erie*, 654 F.3d 324, 333 (2d Cir. 2011).

[75]     *Green v. City of New York*, 465 F.3d 65, 80 (2d Cir. 2006) (quoting *Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 226 (2d Cir. 2004)) (other quotation marks omitted).

[76]     *Id.* (quoting *Sorlucco v. New York City Police Dep't*, 971 F.2d 864, 871 (2d Cir. 1992)).

"the municipality's practice, as opposed to its formal policy, is to engage in the constitutional violation at issue."[77]   However, a policy or custom is not established by a single instance of unconstitutional conduct by an employee.[78]   "Although *Monell* dealt with municipal employers, its rationale has been extended to private businesses [acting under color of state law]."[79]

### C.      Deliberate Indifference to a Serious Medical Need

"[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' proscribed by the Eighth Amendment."[80]   To establish a claim for deliberate indifference, a plaintiff must show that the deprivation of medical care was "sufficiently serious" and that

---

[77]      *Green*, 465 F.3d at 80 (citing *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 125–26 (2d Cir. 2004)).

[78]      *See Oklahoma City*, 471 U.S. at 831 (Brennan, J., concurring in part and concurring in the judgment) ("To infer the existence of a city policy from the isolated misconduct of a single, low-level officer, and then to hold the city liable on the basis of that policy, would amount to permitting precisely the theory of strict *respondeat superior* liability rejected in *Monell*.").

[79]      *Rojas v. Alexander's Dep't Store*, 924 F.2d 406, 408–09 (2d Cir. 1990) (holding that employer could not be held liable for section 1983 violation of "quasi-public" employee under *respondeat superior*).   *Accord Whalen v. Allers*, 302 F. Supp. 2d 194, 203 (S.D.N.Y. 2003) (private employer, considered a state actor within section 1983, could not be held liable in the absence of unconstitutional policy, custom, or practice).

[80]      *Estelle v. Gamble*, 429 U.S. 97, 101 (1976).

the charged official acted with a "sufficiently culpable state of mind."[81]  Thus, "[t]o

show that he has been subjected to cruel and unusual punishment, a prisoner must

satisfy a standard that includes both objective and subjective components."[82]

"There is no settled, precise metric to guide a court in its estimation of

the seriousness of a prisoner's medical condition,"[83] and "the serious medical need

inquiry must be tailored to the specific circumstances of each case."[84]  The Second

Circuit has set forth factors to guide this analysis, including:  "(1) whether a

reasonable doctor or patient would perceive the medical need in question as

'important and worthy of comment or treatment'; (2) whether the medical

condition significantly affects daily activities; and (3) the existence of chronic and

substantial pain."[85]  A "serious" medical condition is one that may "produce death,

degeneration or extreme pain."[86]  "In cases where the inadequacy is in the medical

---

[81]    *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir. 1994).

[82]    *Taylor v. Goorde* [sic], No. 13-1196-pr., 2013 WL 6670716, at *1 (2d Cir. Dec. 19, 2013) (citing *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009)).

[83]    *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003).

[84]    *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003).

[85]    *Brock*, 315 F.3d at 162 (quoting *McGuckin v. Smith*, 974 F.2d 1050, 1059–60 (9th Cir. 1992)).  *Accord Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir. 1998).

[86]    *Johnson v. Wright*, 412 F.3d 398, 403 (2d Cir. 2005).

treatment given, the seriousness inquiry is narrower."[87]  When considering an alleged temporary delay or interruption in the provision of medical care, "the seriousness inquiry 'focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone.'"[88]

In addition to establishing an objectively serious medical need, a plaintiff bringing Eighth Amendment deliberate indifference claims must prove that the defendants acted with a sufficiently culpable state of mind.[89]  "An official acts with the requisite deliberate indifference when that official 'knows of and disregards an excessive risk to inmate health or safety.'"[90]  "[A]n Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm."[91] "Deliberate indifference is 'a state of mind that is the equivalent of criminal

---

[87]     *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006).

[88]     *Id.* (quoting *Smith*, 316 F.3d at 185).

[89]     *See Phelps v. Kapnolas*, 308 F.3d 180, 185–86 (2d Cir. 2002).

[90]     *Chance*, 143 F.3d at 702 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

[91]     *Farmer*, 511 U.S. at 842.

recklessness.'"[92]  Thus, deliberate indifference is more substantial than mere

disagreement over a course of treatment, negligence or even medical malpractice.[93]

### D.    Exhaustion of Administrative Remedies

The PLRA requires that prisoners completely exhaust all

administrative remedies before bringing an action in federal court regarding prison

conditions.[94]  An inmate must comply with the procedural requirements of his

prison's grievance system as "the PLRA exhaustion requirement requires proper

exhaustion."[95]  However, in the Second Circuit, failure to completely exhaust

administrative remedies may be excused if:  "(1) administrative remedies were not

in fact 'available to the prisoner,' (2) 'defendants' own actions inhibit[ed]'

exhaustion, or (3) 'special circumstances . . . justify' non-exhaustion."[96]  Grievance

---

[92]    *Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003).

[93]    *See Estelle*, 429 U.S. at 106 ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment."); *Chance*, 143 F.3d at 703.

[94]    *See* 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.").

[95]    *Woodford v. Ngo,* 548 U.S. 81, 93 (2006).

[96]    *Messa v. Goord*, 652 F.3d 305, 309 (2d Cir. 2011) (quoting *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir. 2004)) (other quotations omitted). Despite some tension with the Supreme Court's decision in *Woodford*, the Second

-19-

procedures are not considered "available" unless "'a similarly situated individual of ordinary firmness' would have deemed them available."[97]  Thus, an inmate-plaintiff's failure to exhaust administrative remedies may be excused if he has not been informed of the procedural requirements for availing himself of the remedy.[98]

## IV.    DISCUSSION

### A.    Administrative Exhaustion

Defendants argue that Santana has failed to exhaust administrative remedies because he did not request a second opinion as required by DOC procedures.  It is uncontested that Santana never submitted a request for a second opinion and did not follow up on his three grievances.  Santana claims that he never received a brochure detailing the second opinion policy and that he had no

---

Circuit has yet to overrule the three part test outlined in *Hemphill*.  *See Johnston v. Maha*, 460 Fed. App'x 11, 15 (2d Cir. 2012) (although *Woodford* "requires that prisoners 'properly' exhaust the available remedies under the PLRA, it certainly does not abrogate the unavailability defense to nonexhaustion [as set out in *Hemphill*]" (citing *Macias v. Zenk*, 495 F.3d 37, 45 (2d Cir. 2007); *Kaba v. Stepp*, 458 F.3d 678, 684, 686 (7th Cir. 2006))).

[97]    *Hemphill*, 380 F.3d at 686 (quoting *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003)).

[98]    *See Rivera v. New York City*, No. 12 Civ. 760, 2013 WL 6061759, at *4 (S.D.N.Y. Nov. 18, 2013) ("District courts have consistently held that an administrative remedy is not available to an inmate who is not informed of the grievance procedure." (citing *Burgess v. Garvin*, No. 01 Civ. 10994, 2004 WL 527053, at *3 (S.D.N.Y. Mar. 16, 2004); *Arnold v. Goetz*, 245 F. Supp. 2d 527, 538 (S.D.N.Y. 2003))).

knowledge of this procedure.  Further, he claims that he was led to believe that the

administrative grievance process was futile because his three attempts to submit

grievances went unanswered.  While defendants contend that inmates are given

brochures outlining the medical complaint process, and that second opinion forms

are available in the medical clinic, they have submitted no evidence that the new

medical grievance policies were actually publicized.[99]  There is no indication, or

even an allegation from defendants that Santana had actual knowledge of the new

medical grievance procedure.  Thus, Santana has raised an issue of fact as to

whether he should be excused from the requirement of administrative exhaustion.

However, this issue need not be resolved because even if Santana were excused

from administrative exhaustion, defendants would still be entitled to summary

judgment.[100]

### B.    Deliberate Indifference to a Serious Medical Condition

---

[99]    Indeed, defendants have not submitted evidence that the procedures they outline are actually in force, as the brochure submitted into evidence only contains contact information for community health clinics.  *See* Patient Information Brochure, Ex. K to Waldauer Decl.

[100]    Complete administrative exhaustion is a necessary prerequisite to Santana's claims.  *See* 42 U.S.C. § 1997e(a).  However, because "exhaustion is not jurisdictional," the Court can reach the merits of this case without resolving the issue of administrative exhaustion.  *Richardson v. Goord*, 347 F.3d 431, 434 (2d Cir. 2003).

Santana alleges that he was deprived of sleep apnea treatment in violation of his constitutional rights.  It is undisputed that Santana's sleep apnea was not treated at the Brooklyn Detention Center or the Manhattan Detention Center.  However, Santana has not established that his sleep apnea was sufficiently serious that a failure to treat him with a CPAP machine or to transfer him to a facility which provides this treatment violated the Constitution.

Santana has established that his sleep apnea has been diagnosed and that he was treated with a CPAP machine by several doctors, but this is not sufficient to establish that a reasonable doctor would inevitably find his disease "'important and worthy of comment or treatment.'"[101]  Dr. Lin and Dr. Fadil opine that Santana's sleep apnea is "moderate" rather than "severe."[102]  In an unsworn letter, Dr. Fadil contradicts his own medical notes by stating that Santana has "severe" sleep apnea.[103]  In this letter, Dr. Fadil states that Santana's CPAP machine treatment is "medically necessary," and goes on to list the complications of untreated sleep apnea:  "heart attacks, strokes, hypertension, and chronic fatigue."  But this opinion is not offered as to Santana's condition.  It is a statement

---

[101]    *Brock*, 315 F.3d at 162.

[102]    Sleep Clinic Records at 15; Lin Report at 2.

[103]    Sleep Clinic Records at 1.

solely about the potential complications of sleep apnea in general.[104]  Dr. Lin, who

is defendants' designated expert, opines that there are no physiological

complications of moderate sleep apnea other than fatigue and that Santana's sleep

apnea did not cause his other medical conditions.[105]  Although he disputes Dr.

Lin's assertion, Santana has not submitted any evidence that he has suffered

physiological complications as a result of defendants' failure to treat his sleep

apnea.[106]

Santana has not adduced facts establishing that the lack of a CPAP

machine "significantly" affected his daily activities, or caused "chronic and

substantial pain."[107]  Prior to his first treatment, Santana was experiencing snoring,

gasping and choking, and excessive daytime sleepiness.[108]  Throughout his

incarceration, Santana apparently did not report pain during any of his medical

---

[104]    I note that Dr. Fadil is a treating physician, not a Rule 26 expert.  *See*
Fed. R. Civ. P. 26(a)(2).

[105]    *See* Lin Report at 1–2.

[106]    Santana has submitted evidence that sleep apnea may be considered a
serious disease and can result in potentially fatal complications.  *See* Santana 56.1
¶ 5.  However, he has not submitted any evidence that his own sleep apnea will
lead to complications putting him at increased risk of death or degeneration.  *See*
*Johnson*, 412 F.3d at 403.

[107]    *Brock*, 315 F.3d at 162

[108]    *See* Santana 56.1 ¶ 2.

examinations, and in medical records from the Brooklyn Detention Center, his vital signs and mental status were consistently recorded as normal.[109]  The only potential medical evidence that Santana suffered adverse effects from lack of a CPAP machine are that he was "somnolent" during one of his evening examinations.[110]  However, a single observed instance of drowsiness does not evidence constitutionally cognizable adverse effects.  Thus, the record does not indicate that failure to treat Santana's sleep apnea with a CPAP machine caused him to suffer "chronic and substantial pain."[111]

Further, Santana has failed to prove that either individual defendant possessed the requisite state of mind to support section 1983 liability.  Santana has not shown that either Dr. Shpits or Dr. Akhtar deliberately disregarded an excessive risk to Santana's health or safety.  Although Santana alleges that he told both doctors that he required a CPAP machine because he could die in his sleep, Santana's subjective beliefs about his condition are not sufficient to support the

---

[109]   *See* DOC Medical Records at CHS 008, 011, 021–22, 024, 026–29.

[110]   *See id.* at CHS 011.

[111]   *Johnson*, 412 F.3d at 403. Santana has alleged that he experienced and reported some pain, but the most significant allegation concerns a period when he was incarcerated on Rikers Island and being treated with a CPAP machine.  *See* Pl. Mem. at 10–11.  Santana has not alleged that he reported pain to either Dr. Akhtar or Dr. Shpits.

conclusion that either doctor was deliberately indifferent to his medical needs.
There is no evidence that Santana's sleep apnea is a life-threatening illness, in spite
of what he may have told the defendants.  Moreover, Santana does not claim that
he reported to either doctor that he was in pain, and there is no evidence in his
medical records that he ever reported pain or adverse effects to Dr. Shpits or Dr.
Akhtar.  In short, there are no facts from which a reasonable juror could infer that
risk of substantial harm existed, nor is there evidence that either doctor drew such
an inference.[112]  Summary judgment for Dr. Shpits and Dr. Akhtar is GRANTED.

### C.   Other Claims

Because Santana has not shown that he was deprived of a
constitutional right, there is no basis for *Monell* liability.[113]  Summary judgment for
Corizon and the City is GRANTED.

Finally, Santana alleges that defendants were negligent and violated
New York City Correctional Health Care Minimum Standards.  Violations of
regulations and policies do not give rise to liability under section 1983.[114]  Because

---

[112]    *See Farmer*, 511 U.S. at 837.

[113]    *See Bobolakis v. DiPietrantonio*, 523 Fed. App'x 85, 87 (2d Cir.
2013) (no basis for imposing municipal liability where plaintiff had not suffered a
violation of his constitutional rights).

[114]    *See Patterson v. Coughlin*, 761 F.2d 886, 891 (2d Cir. 1985) ("[A]
state employee's failure to conform to state law does not in itself violate the

there are no remaining federal claims in this case, Santana's pendent state law claims are DISMISSED without prejudice.[115]

## V.    CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is GRANTED.  The Clerk of the Court is directed to close this motion [Docket No. 37] and this case.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated: New York, New York
       May 7, 2014

_____

Constitution and is not alone actionable under § 1983." (citing *Davis v. Scherer,* 468 U.S. 183 (1984); *Pollnow v. Glennon,* 757 F.2d 496, 501 (2d Cir. 1985))).

[115]    *See* 28 U.S.C. § 1367(c)(3).

**- Appearances -**

**Plaintiff (Pro Se):**

Pedro Santana
# 13R2869
Midstate Correctional Facility
P.O. Box 2500
Marcy, New York 13403

**For Defendants:**

Jonathan M. Waldauer, Esq.
Heidell, Pittoni, Murphy & Bach, LLP
99 Park Avenue
New York, New York 10016
(212) 286-8585

-27-